## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DEBORAH MONACO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-2500-KHV |
| | ) | |
| QUEST DIAGNOSTICS, INCORPORATED, | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Deborah Monaco brings suit against Quest Diagnostics, Incorporated for employment discrimination and retaliation in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and the Kansas Act Against Discrimination ("KAAD"), K.S.A. §§ 44-1001 et seq., intentional and negligent infliction of emotional distress and violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601. See Pretrial Order (Doc. #107) filed May 27, 2010. This matter comes before the Court on Defendant Quest Diagnostics Incorporated's Motion For Summary Judgment And Supporting Brief (Doc. #109) filed June 25, 2010. For reasons stated below, the Court sustains defendant's motion in part.

## I.    Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

# I.    Facts[1]

The following facts are either uncontroverted or construed in the light most favorable to plaintiff.

Quest Diagnostics is a leading worldwide provider of diagnostic laboratory testing, information and services.  From December 11, 2002 to October 13, 2006, plaintiff worked for Quest Diagnostics as a clinical laboratory scientist–certified ("CLS") in Lenexa, Kansas.  During this time, Quest Diagnostics increased plaintiff's base salary nearly 14 per cent (from $19.00 to $21.53 per hour) and awarded bonuses with which she was uniformly pleased.

As CLS, plaintiff was responsible for performing various blood tests and ensuring quality control and accurate reporting of blood test results.  Because of patient health concerns, it was "critical" that her testing be accurate.  See Deposition Of Deborah Monaco, Exhibit A to Doc. #109 at 41:16-19, 79:13-22.

From 2002 through May of 2006, plaintiff worked the night shift.  In this position, she reported to Daniel Jobes, the night shift laboratory manager.  During that time, plaintiff had no problems with job performance.

Beginning March 8, 2006, plaintiff requested a leave of absence pursuant to the FMLA.

---

[1]      Pursuant to D. Kan. Rule 56.1, the Court considers only those facts which the parties include in their statement of facts, in numbered fact paragraphs with record citation.  See Vasquez v. Ybarra, 150 F. Supp.2d 1157, 1160 (D. Kan. 2001).  Pursuant to D. Kan. Rule 56.1, for the purpose of summary judgment, the Court deems all such facts admitted unless specifically controverted by the opposing party.  See id.
   The Court does not consider facts which the parties discuss only in the argument section of their briefs and not in a statement of facts pursuant to D. Kan. Rule 56.1.  See Jones v. Unified Gov. Of Wyandotte County/Kansas City, Kan., 552 F. Supp.2d 1258, 1261 n.1 (D. Kan. 2008).
   The Court declines to consider arguments which defendant raises for the first time in its reply brief.  See Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000); Rubio v. Turner Unified Sch. Dist. No. 202, 523 F. Supp.2d 1242, 1252 (D. Kan. 2007).

Quest Diagnostics granted the request. By letter dated April 17, 2006, Dr. Michael J. Everson, plaintiff's physician, recommended that due to her "current medical illness," plaintiff transfer from the night shift to the day shift.[2] The same day, plaintiff requested that Quest Dynamics transfer her from the night shift to the day shift due to her medical condition. Plaintiff requested and received extensions of FMLA leave through May 20, 2006.[3]

On May 19, 2006, plaintiff returned to work on the night shift. The same day, she completed a form requesting accommodation under the ADA. See Plaintiff's Exhibit 5. Specifically, she requested that due to a disability of bipolar mood disorder, Quest Dynamics change her schedule from the night shift to the day shift. See id.

On May 22, 2006, Dr. Everson completed the medical questionnaire portion of plaintiff's ADA request for accommodation form. See id. On the form, Dr. Everson indicated that plaintiff suffered from bipolar mood disorder, "a chronic, long term disorder." Id. He stated that the disorder limited plaintiff's ability to perform the essential functions of her job as follows:

> Bipolar patients have a special sensitivity to sleep cycle disruption which causes decompensation in mood. For this reason, all bipolar patients should work days to keep natural sleep rhythms.

Exhibit B to Doc. #109. Dr. Everson indicated that plaintiff was not taking medications or treatments that would be expected to affect job performance or pose a direct threat or safety risk. See id. The same day, Quest Dynamics received the ADA request for accommodation form which Dr. Everson completed.

---

[2]    The note from Dr. Everson does not identify the medical illness.

[3]    Quest Diagnostics never denied a request by plaintiff for FMLA leave; it consistently granted every FMLA request which she made.

Two days later, at 8:52 a.m. on May 24, 2006, Carolyn VanWinkle, human resources coordinator, sent an email to Jobes stating that she "[j]ust wanted to see if [he] had any concerns or issues arise during Deb's shift last night." Plaintiff's Exhibit 7. The same day, VanWinkle made a handwritten note stating that plaintiff "seemed 'there' and aware last night as opposed to Friday. No speed or performance issues or concerns. He will let us know if anything changes." Id.[4]

On May 26, 2006, Quest Diagnostics notified plaintiff that her medical condition qualified for an accommodation and that it would approve her request to transfer to the day shift. Until May 30, 2006, however, plaintiff continued to work the night shift . During that time, plaintiff did not appear to be medicated and did not "zone out."

On May 30, 2006, plaintiff began working the day shift as a CLS in immunochemistry.[5] In her new position, plaintiff worked from 8:00 a.m. to 4:30 p.m. under the supervision of Jacque Perez, day shift supervisor, who reported to Scott Mattivi, day shift manager. Plaintiff liked Perez and Mattivi and was "very pleased" with the accommodation. Mattivi considered the transfer to be a "sensitive" case because it was the only time that he had been aware of an employee who had transferred pursuant to the ADA. As a result of the transfer, plaintiff's duties changed and she assumed some new tasks, but her title and compensation did not change.

At 5:19 p.m. on May 30, 2006, Cynthia Duy, an employee from the second shift, sent Perez an email regarding plaintiff.[6] The email stated as follows:

Deb left all of the specimens for me to put up. Unfortunately, I probably will not

---

[4]      Although the record is not clear, based on context, it appears that VanWinkle was referring to Jobes as the "he" who would let them know if anything changed.

[5]      In 2006, May 30 was a Tuesday, the day after Memorial Day.

[6]      The record does not identify the hours of the second shift.

have time.  So they will be on a cart for her to put up in the morning.  She also left me all of the paperwork for every centaur to put up.  Of course, I have to first print out her run on every machine.  Could you please explain to her that these are duties that she needs to attend to before she leaves for the day?

Plaintiff's Exhibit 9.

The next day, May 31, 2006, the following events occurred:

At 8:42 a.m., Jessica Ford, lab assistant, sent Perez an email which reported that on the previous day (May 30), plaintiff had taken pills and multiple breaks, spaced off a lot and spoke incoherently.  Specifically, Ford stated as follows:

Just wanted to let you know that I observed a few things yesterday May 30th that caused some concern.  Deb had gone to her drawer and gotten her purse approximately six different times.  Each time she removed pills from her purse and would then take about a 10-15 minute break.  At first I just assumed she was on her break but as she continually did this I discovered that she wasn't.  As the day wore on I noticed that she seemed to space off a lot.  It was almost as if she was looking right through you and when she did manage to say something it was very incoherent and I had to ask her to repeat herself several times until I could finally understand what she was trying to say and then it was only something as simple as "Have you seen a ruler around here."
Just thought I would let you know.

Plaintiff's Exhibit 10.

At 9:03 a.m., VanWinkle, Perez and Mattivi met to discuss Ford's email.  VanWinkle's notes from the meeting state as follows:

– continue to monitor performance/behavior
– conduct door punch to verify if add'l breaks were taken.

Plaintiff's Exhibit 14.

At 10:38 a.m., VanWinkle sent an email to Rita Mohr and Pat Bjuland which stated as follows:

FYI . . . I had a meeting with Scott Mattivi and Jacque Perez to discuss Deb's performance/behavior. A co-worker had sent an email to Jacque advising Deb had

been noticed taking medication (per her FMLA medical certification and the ADA documentation she is on medication) and then taking additional breaks.  I did confirm that her ability to complete her work was not compromised, however, did advise that the additional breaks be addressed by conducting a door punch report to verify her presence.  If it is collaborated that she had taken additional breaks then she will be addressed with an Improvement Action for Misuse of Company time.  In the meantime they are to closely monitor her work performance and let me know if any changes occur.  I will continue to monitor the ADA transition and keep you advised.

Plaintiff's Exhibit 13.[7]

At 12:58 p.m., Perez forwarded Ford's email to VanWinkle.

At 12:59 p.m., Perez forwarded Duy's email to VanWinkle with the following message:

This is something I feel that she just didn't understand yet.  We will go over this at the end of the day today.

Plaintiff's Exhibit 9.

At 3:30 p.m., Perez sent herself an email which stated that she had spoken with plaintiff around noon and that plaintiff "seemed normally coherent, and said it may take a couple of weeks for her to adjust back to a 'normal' shift, that about 11 am her body wanted to sleep."  Plaintiff's Exhibit 11.  Perez also wrote that she had spoken plaintiff around 3:00 p.m. and again at 3:30 p.m. and that "she seemed coherent and her talk was fine."  Id.  Perez wrote as follows: "I am ok with her performance today."  Id.

Two days later, on June 2, 2006, at 2:00 p.m., VanWinkle met with Mattivi and Perez to discuss plaintiff's ADA accommodation.  VanWinkle's notes from the meeting state as follows:

Scott and Jacquie [sic] advised that Deb Monaco is having some performance issues; not completing tasks that she had been advised of previously, inappropriate behavior (slamming papers on a counter because of frustration w/co-worker).

I advised that the only accommodation provided to Deb was a shift change and that she will be held to the same level of performance as her co-workers; keeping in mind

---

[7]        The record does not identify Mohr and Bjuland.

that she is training on some new tasks.

Scott adv that he will start her formal training process next week and will document her progress (by having the trainer and trainee sign off on completed tasks/this is done for every employee). I advised them that I will plan on following up with Deb and remind her that she is to perform as everyone else and to go over any potential issues she may be having.

Plaintiff's Exhibit 15.

A week later, on June 9, 2006, VanWinkle met with plaintiff. The same day, VanWinkle emailed Mattivi and Perez the following account of the meeting:

FYI . . . I had a brief meeting with Deb to discuss her shift change accommodation this morning. . . . She has advised me that she is making the adjustment and enjoys working with her co-workers. She also stated that she appreciates Jacque maintaining open communications regarding her progress. Please feel free to contact me at anytime if I can be of further assistance. I did share with her that it is your intent to begin a formal training program and that she will be held to the same level of performance expectations as her co-workers. * * *

Plaintiff's Exhibit 30. VanWinkle did not mention any performance issues to plaintiff.

On June 13, 2006, plaintiff was to start "formal training" on the day shift. The record does not reflect whether she received such training.

Nearly a month later, on July 12, 2006, Ford told plaintiff that she had been instructed to watch her. The same day, plaintiff met with VanWinkle and complained that she felt she was being "watched" and "discriminated" against. VanWinkle asked plaintiff to write down her allegations. Plaintiff wrote as follows:

My concerns are that employees other than my superiors have been ordered by my superiors to watch me to "document" everything I do. I have been told by an un-named source that information was given that I "zone out" at times due to my "medications," and I need to be watched for this.

I would rather be told upfront [sic] if I am not doing a good job. I have only been on this bench for 6 wks and changes in operations have occurred almost daily since then, as we are growing by leaps & bounds. My ADA placement is a private matter

8

and I feel I am being discriminated against for my medical condition.

Defendant's Exhibit E. VanWinkle advised plaintiff that she would investigate the matter.[8]

As a result of her investigation, VanWinkle determined that Perez had asked Ford to monitor plaintiff's performance and report back to her.[9]

On July 13, 2006, VanWinkle met with Perez to discuss plaintiff. According to VanWinkle's notes, plaintiff had recently complained that Jennifer Smith was treating her unprofessionally.[10] Perez stated that she was frustrated with plaintiff's inability to complete her work, but that she had not given plaintiff feedback regarding her job performance. See Plaintiff's Exhibit 16.

On July 19, 2006, Mattivi met with Perez and coached her that it was inappropriate to ask a peer to watch another peer.

The next day, July 20, 2006, VanWinkle met with Perez and told her that it was inappropriate to have a subordinate watch a co-worker. VanWinkle's notes from the meeting state that Perez would have a discussion with Ford regarding "the conversation she had w/her requesting she keep an eye on Deb Monaco's activities." Plaintiff's Exhibit 18.

Perez did not tell Ford to stop monitoring plaintiff's activities. She had asked plaintiff's co-workers to monitor plaintiff's performance after she received Ford's email of May 30, 2006. Other than plaintiff, VanWinkle was not aware of any other employee whom a supervisor asked co-workers to watch.

Mattivi testified that plaintiff was monitored for several reasons including (1) human

---

[8]    Plaintiff had not personally observed anyone watching her in an unusual way. A couple of days later, VanWinkle told plaintiff that she had addressed her concerns.

[9]    The record does not reflect when VanWinkle made this determination.

[10]    The record does not identify Smith.

resources' request that Perez keep close tabs on plaintiff; (2) plaintiff's reputation; and (3) concerns

of other employees about plaintiff's odd behavior and other issues.[11]  See Mattivi Depo. at 63:9-25,

65:1-13, Plaintiff's Exhibit 33.  Mattivi stated that Perez needed information so that Perez could

report to HR promptly and completely on the sensitive personnel issue involving plaintiff.  See id.

at 65:5-20.  Mattivi believed that in her attempt to be complete and diligent in reporting, Perez had

made some errors in judgment which led to inappropriate things being said and done against

plaintiff.  See id. at 65:21 to 66:5.[12]

Rita Mohr, human resources director, testified that while there might be better ways to

monitor the quality of plaintiff's work, it was "terribly wrong" for Perez to ask Ford to monitor

plaintiff's work.  Mohr Depo. at 23:2-12, Plaintiff's Exhibit 32.

At 10:00 a.m. on August 1, 2006, VanWinkle met with Mattivi and Perez regarding

plaintiff's job performance.  VanWinkle's notes from the meeting state as follows:

> Scott and Jacque shared that there have been numerous instances of Deb Monaco not
> performing her job in an acceptable manner.  The last incident occurred when she
> failed to follow departmental procedures and as a result, patient results were not
> available until Monday (07/31/06).  This is outside of the expected return of results
> within 24 hours.
>
> I advised them that she should be held to the same level of expectations as other
> employees and as a result, it would appropriate to issue a Verbal [Improvement
> Action ("IA")].  I also suggested that the IA be presented by both Scott and Jacque.
> Advised Pat Bjuland of the status of the case and she agreed with the actions.

Plaintiff's Exhibit 19.

On August 2, 2006, Mattivi and Perez gave plaintiff an improvement action notice for delay

---

[11]     The record does not disclose information regarding plaintiff's "reputation."

[12]     Mattivi could not recall what errors Perez made and what inappropriate things were
said and done to plaintiff.  See Mattivi Depo. at 66:6 to 67:4.

in reporting results. The notice states that the current level of discipline was "Verbal."[13] It was

signed by plaintiff and Perez and contained the following supervisor/manager remarks:

> On 7/31/06 at approximately 2PM it was discovered that the last patient run from Saturday 7/29/06 from Deb's run on Centaur #1 was not released. When QC was loaded for the patient run on 7/31/06 the patients from Saturday were finally released. This is not the first time there have been delays in reporting in Deb's work and this issue had been discussed with her previously.

Plaintiff's Exhibit 20. According to Perez, plaintiff's performance problems on the day shift were

"mostly the delay in patient results and the delay in stats not getting reported and the delay – just

delays in general, not being able to keep up with it." Perez Depo. at 144:19 to 145:8, Plaintiff's

Exhibit 12.

The same day, the following events occurred:

A co-worker, Michael Morris, told plaintiff that "[t]hey told us all to baby-sit you."

Plaintiff's Depo. at 127:9-13, Plaintiff's Exhibit 2.

Around 2:00 p.m., plaintiff met with Perez to discuss the improvement action notice. At the

meeting, plaintiff stated that she believed that the department was out to "get" her. Later that day,

Perez emailed Mattivi regarding her meeting with plaintiff. In the email, Perez stated as follows:

> About 2pm Deb came to talk to me. She asked if there was any way we could retract the verbal warning because she just had to get out of my department. I told her I'd have to talk to Scott about it. She kept saying that people were out to get her and that she just can't work like that. She then said she didn't want to work for ME anymore (she emphasized it), and I asked her why. She said that if "they" had done what they were supposed to do, that HR should have told me by now. I told her that I was informed of some things from HR, but that much of what I heard that I had supposedly said had been taken out of context, and that rumors do seem to be flying around the department. I explained that anything that happened to get brought to me [sic] attention that was untrue I attempted to squelch it. I explained that we were not out to "get" her, and that if she followed our corrective action then she will have no problems. She said again that other certain people were out to get her, and they were

---

[13]     The record does not reflect the levels of discipline at Quest Dynamics.

making it difficult for her to work and that working under those circumstances she would make mistakes and end up getting fired and that she really needed this job. She said again that she needed to get out of the area because she can't work in the situation she's been placed under. I mentioned that she wanted to come to days; she said that she had no idea where they were going to put her. I do have documentation that everything was going fine in the department the first 3-4 weeks. * * *

Plaintiff's Exhibit 22.

At 5:07 p.m., Mattivi emailed VanWinkle advising that he and Perez had given plaintiff an improvement action notice. In the email, Mattivi stated as follows:

Jacque and I met with Deb this morning to discuss her work issues. Jacque issued a verbal warning and had Deb sign it. We explained the issues, what needed to be done to correct the issues.

Deb had a couple of questions. She wanted to know if she were eligible to transfer to a different area if she were under a verbal warning (no). She wanted to know why the statement ... "failure to see immediate and sustained improvement in job performance may lead to further disciplinary action up to and including termination" was on the form. I informed her that this was a standard statement that appears on all IA forms. She also wanted to know how many steps of disciplinary action you have to go through before you are terminated. I told her that it depends on the severity of the issue. Typically the steps are counseling, verbal, written, probation, termination but that sometimes steps are skipped due to the severity of the issue.

Deb signed off the Improvement action and we left things at that for now.

Plaintiff's Exhibit 22.

The next day, on August 3, 2006, at 7:09 a.m., VanWinkle responded to Mattivi's email as follows:

Thank you for the update. . . . you guys did a great job!

Plaintiff's Exhibit 23.

The next day, at 1:15 p.m. on August 4, 2006, VanWinkle met with Bjuland and Rachel

James regarding an alleged threat by plaintiff to kill Ford.[14]  VanWinkle's notes from the meeting

state as follows:

> I advised Pat that I had had a meeting w/J. Perez, Scott Mattivi, and Jessica Ford. Jessica Ford had shared an incident . . . Deb Monaco had called her on the phone and requested her home address and phone number and not knowing for what J. Ford provided the information.  Deb later in the conversation made a threat to kill J. if she shared the conversation w/anyone.  D. Monaco also requested that J. Ford try to solicit the address and phone number of another employee, Mike Morris. * * *

> Pat advised that I should have a meeting w/S. Mattivi and Deb Monaco on her first day bk to work on 08/07/06 and to question her regarding the incident.  Depending on the feedback I would send her home w/pay while under investigation or allow her to continue her shift.

Plaintiff's Exhibit 24.

Later that day, at 3:19 p.m., VanWinkle met with Ford to discuss the alleged threat.

VanWinkle's notes from the meeting state as follows:

> Scott Mattivi brought J. Ford to my office and advised that she had new information regarding D. Monaco to share.  S. Mattivi left the meeting at that time.  J. Ford shared that her finance [sic] had called and advised a female by the name of Deb had called and asked him to call J. Ford at work and have her call her back, because she cannot let anyone at work know she is calling.  * * *

> At the end of the meeting I counseled J. Ford that she should place a police report regarding the threat Deb made towards her.  In addition, I adv that she should not share any information regarding this incident w/co-workers and not engage in conversation w/D. Monaco.

Plaintiff's Exhibit 26.

In August of 2006, plaintiff transferred to the general chemistry department.[15]  Mattivi

allowed the transfer to see whether plaintiff's problems were individual or department-related and

---

[14]     The record does not identify James.

[15]     The record does not reflect the exact date of the transfer.

13

to give plaintiff a clean start in another department without preconceived notions.[16]

On August 16, 2006, plaintiff filed a complaint with the Kansas Human Rights Commission ("KHRC") alleging that Quest Diagnostics had discriminated and retaliated against her because of her disability. See Exhibit A to Plaintiff's First Amended Complaint, Demand For Jury Trial And Designation Of Place Of Trial ("First Amended Complaint") (Doc. #25) filed June 26, 2009.

On October 13, 2006, plaintiff resumed leave under the FMLA. While plaintiff was on FMLA leave, at 2:47 p.m. on October 22, 2006, Mattivi and VanWinkle discussed plaintiff's job performance and decided to give her a second improvement action notice. VanWinkle's notes from the conversation state as follows:

> – I advised that per Pat Bjuland we will need to make sure that D.M. has a clear understanding of her performance expectations.
>
> – Scott clarified that D.M. had received and signed the performance expectations and she is not meeting the requirements as outlined in the form. He also adv. that at this time she should be crossing over to another area, but due to her performance has not done so. She will receive an IA.

Plaintiff's Exhibit 27.[17]

Plaintiff did not return to work after October 13, 2006. Plaintiff and her doctor believe that as of that date, she was totally disabled due to bipolar depression, and that she was unable to return to work.[18] See Plaintiff's Depo. at 5:15-25, 265:25 to 266:1, Defendant's Exhibit A.

---

[16]     Although the record is not clear, it appears that in the general chemistry department, plaintiff reported to a different supervisor who reported to Mattivi. Because plaintiff had received a verbal warning, she was not eligible for an intra-managerial transfer.

[17]     The record does not reflect whether plaintiff received the second IA.

[18]     The record does not the reflect the date on which it became clear that plaintiff would not return to work. On an unspecified date, Quest Dynamics placed plaintiff on extended leave of absence. Quest Dynamics continued to pay 100 per cent of plaintiff's health benefits.

On December 21, 2006, Quest Dynamics sent plaintiff a letter stating that her FMLA leave was approved from October 17 through October 26, 2006, at which time her FMLA hours would exhaust. See Plaintiff's Exhibit 4. The letter stated that Quest Dynamics would give plaintiff a general leave of absence to cover the remaining time requested by her physician, until January 9, 2007. See id. Regarding health insurance premiums, the letter stated as follows:

> Your payment of premiums for health insurance will continue on the biweekly payroll schedule basis during the period of FMLA leave. Your portion of the premium will continue to be withheld from your paycheck if you have paid leave. If you are on leave without pay, you have a minimum 30-day grace period in which to make your premium payments. If payment is not made timely, your group health insurance may be canceled. We will notify you in writing before your health coverage will lapse. If you do not return to work following FMLA leave, you may be required to reimburse the LabOne, Inc. for its portion of the health insurance premiums paid on your behalf during FMLA leave. * * *

Id.

On March 9, 2007, Mattivi completed an assessment of plaintiff's job performance. Mattivi stated that plaintiff's work was "very satisfactory" and that she "usually produces error free work." Mattivi Depo. at 99:4-15, Plaintiff's Exhibit 33. Supervisors typically complete employee performance assessments. Mattivi does not recall why he completed plaintiff's assessment. Although company policy required him to do so, Mattivi did not discuss the assessment with plaintiff.

On June 16, 2007, plaintiff filed an amended complaint with the KHRC. In the complaint, plaintiff charged as follows:

> I.      I am disabled. I have openly opposed acts and practices forbidden by the Kansas Act Against Discrimination.

> II.      I have been employed by the Respondent since December 11, 2002. I currently hold the position of Medical Lab Technician.

15

A.     From May 30, 2006 to at least August 7, 2006, I was subjected to verbal abuse, my medical information being released to my co-workers, and disparate treatment compared to similarly situated non-disabled employees, in that my actions were closely monitored.

B.     On August 2, 2006, I received a verbal reprimand.

III.     I hereby charge Quest Diagnostics and its Representatives with a violation of the Kansas Act Against Discrimination, in that I was subjected to verbal abuse, disparate terms, conditions, and privileges of employment, and a reprimand due to my disability.

Exhibit B to First Amended Complaint (Doc. #25).

On September 5, 2007, the Social Security Administration granted plaintiff disability benefits retroactive to October 13, 2006, due to a primary diagnosis of affective (mood) disorder and a secondary diagnosis of personality disorders.[19]

## III.     Analysis

Plaintiff asserts eight claims against defendant: (1) discrimination on account of disability in violation of the ADA and KAAD; (2) harassment on account of disability in violation of the ADA and KAAD; (3) retaliation in violation of the ADA and KAAD; (4) constructive discharge;[20] (5) negligent infliction of emotional distress; (6) intentional infliction of emotional distress; (7) retaliation in violation of the FMLA; and (8) interference with rights under the FMLA. See Pretrial Order (#107) at 7-11. Defendant seeks summary judgment on all claims.

---

[19]     The record does not reflect when plaintiff applied for social security benefits.

[20]     With respect to her constructive discharge claim, plaintiff does not cite an underlying statute or legal theory. See Pretrial Order (Doc. #170) at 9.

## A.      Disability Discrimination

Plaintiff claims that defendant discriminated on account of disability in violation of the ADA and KAAD.  Those statutes prohibit an employer from discriminating against a qualified individual with a disability because of the individual's disability with respect to terms, conditions, and privileges of employment.  See 42 U.S.C. § 12112(a); K.S.A. § 44-1009(a)(1).[21]  Plaintiff bears the initial burden of establishing a prima facie case of discrimination.  To do so, she must show that (1) she is disabled within the meaning of the ADA; (2) with or without reasonable accommodation, she is qualified to perform the essential functions of the job; and (3) defendant discriminated against her because of her disability.  See Butler v. City of Prairie Vill. Kan., 172 F.3d 736, 747-48 (10th Cir. 1999); Aramburu v. Boeing Co., 112 F.3d 1398, 1403 n.3 (10th Cir. 1997) (ADA standards and

---

[21]      The ADA provides as follows:

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

The KAAD provides as follows:

a) It shall be an unlawful employment practice:

(1) For an employer, because of the . . . disability . . . of any person to refuse to hire or employ such person to bar or discharge such person from employment or to otherwise discriminate against such person in compensation or in terms, conditions or privileges of employment; to limit, segregate, separate, classify or make any distinction in regards to employees; or to follow any employment procedure or practice which, in fact, results in discrimination, segregation or separation without a valid business necessity.

K.S.A. § 44-1009(a)(1).

17

burdens apply to KAAD claim).[22]

### 1.    Whether Plaintiff Was Qualified

Defendant asserts that as October 13, 2006 (the last day plaintiff worked), plaintiff cannot establish the second element of a prima facie case, i.e. that with or without reasonable accommodation, she was qualified to perform the essential functions of her job.[23] Plaintiff responds that defendant has retained her on indefinite leave of absence for four years, and that this fact demonstrates a genuine issue of material fact as to whether she can return to work. See Plaintiff's Response To Defendant's Motion For Summary Judgment (Plaintiff's Response") (Doc. #112) filed July 16, 2010 at 51. The Court disagrees. The record establishes that plaintiff applied for and received total disability social security benefits retroactive to her last day of work, October 13, 2006.[24] Moreover, plaintiff testified that she and her doctor believe that as of October 13, 2006, she

---

[22]    If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions. See Davidson v. Am. Online, Inc., 337 F.3d 1179, 1189 (10th Cir. 2003) (burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to ADA disparate treatment claims); Reynolds v. Sch. Dist. No. 1, Denver, Colo., 69 F.3d 1523, 1533 (10th Cir. 1995). If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief." Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)).

Here, defendant's motion challenges only whether plaintiff can establish a prima facie case. See Defendant's Motion (Doc. #109) at 16-18. Accordingly, the Court does not address whether defendant has articulated a legitimate nondiscriminatory reason or whether plaintiff can show pretext.

[23]    Defendant's motion does not challenge whether plaintiff can establish the first element of a prima facie case, i.e. that she is disabled within the meaning of the ADA. Accordingly, the Court does not address that issue.

[24]    This facts does not automatically bar plaintiff from asserting a disability discrimination claim; however, it constitutes evidence relevant to a determination whether plaintiff is a qualified individual with a disability. See Rascon v. US West Commc'ns, Inc., 143 F.3d 1324,

(continued...)

18

was totally disabled and unable to work.  See Plaintiff's Depo. at 5:15-25.  To controvert this evidence, plaintiff points only to the fact that defendant has retained her on indefinite leave of absence for four years.[25]  She presents no evidence that with or without reasonable accommodation, she could perform the essential functions of her job after that date.  On this record, plaintiff has not established a genuine issue of material fact whether with or without reasonable accommodation, she was qualified to perform the essential functions of her job after October 13, 2006.  Accordingly, defendant is entitled to summary judgment on plaintiff's claims for disability discrimination after October 13, 2006.[26]

### 2.    Whether Plaintiff Suffered Adverse Employment Action

Defendant asserts that plaintiff cannot establish the third element of a prima facie case, i.e. that defendant discriminated because of her disability.  To meet this element, plaintiff must show that defendant subjected her to adverse employment action because of her disability.  See Anderson v. Gen. Motors Corp., No. 79-3388, 1999 WL 240242, at *1 (10th Cir. April 20, 1999); Nealey v. Water Dist. No. 1 of Johnson County, Kan., 554 F. Supp.2d 1226, 1233 (D. Kan. 2008).  Plaintiff claims that because of her disability, defendant subjected her to the following adverse employment actions (1) having co-workers monitor her job performance; (2) not training her on the

---

[24](...continued)
1332 (10th Cir. 1998); see also Johnson v. Lindon City Corp., 405 F.3d 1065, 1068 (10th Cir. 2005) (recognizing limited applicability of judicial estoppel).

[25]    At most, this fact shows that defendant believed that plaintiff might become qualified to work at an uncertain time in the future.

[26]    Construed in a light most favorable to plaintiff, the evidence suggests that before October 13, 2006, plaintiff was performing the essential functions of her job.  Accordingly, defendant is not entitled to summary judgment on grounds that plaintiff cannot show that she was qualified to perform the essential functions of her job before October 13, 2006.

day shift; (3) giving her an IA on August 2, 2006; and (4) forcing her to take medical leave on October 13, 2006. See Pretrial Order (Doc. #107) at 4-5. Defendant contends none of these actions constitute adverse employment action. See Defendant's Motion (Doc. #109) at 17-18.[27]

The Tenth Circuit liberally defines what constitutes adverse employment action and requires courts to take a case-by-case approach when considering whether certain actions constitute adverse employment actions. See Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998). Said actions are not limited to monetary losses in the form of wages or benefits, but a mere inconvenience or an alteration of job responsibilities does not constitute adverse employment action. See id. Plaintiff must show that the employer's conduct was "materially adverse" to her job status. Wells v. Colo. Dept. of Transp., 325 F.3d 1205, 1213 (10th Cir. 2003) (quoting Sanchez, 164 F.3d at 533)).

Plaintiff asserts that by having co-workers monitor her job performance, defendant subjected her to adverse employment action. Plaintiff presents no evidence, however, which suggests that co-worker monitoring was materially adverse to her job status. See, e.g., Tapia v. City of Albuquerque, 170 Fed. Appx. 529, 534 (10th Cir. 2006) (having co-workers monitor plaintiff's work did not alter employment status and did not constitute adverse employment action). On this record, plaintiff has not established a genuine issue of material fact whether having co-workers monitor her job performance constitutes adverse employment action for purposes of disability discrimination.

Plaintiff asserts that by not training her on the day shift, defendant subjected her to adverse employment action. As an initial matter, plaintiff presents scant evidence that defendant did not

_____

[27]     Defendant's motion does not challenge whether plaintiff can show that it took such actions because of her disability. See Defendant's Motion (Doc. #109) at 17-18. Accordingly, the Court does not address whether plaintiff can show that defendant acted "under circumstances which give rise to an inference that [said actions were] based on her disability." Butler, 172 F.3d at 748 (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

20

train her on the day shift. Plaintiff states that she was supposed to receive formal training on June 13, 2006, and that none of defendants' witnesses can verify whether she got that training. See Plaintiff's Response (Doc. #112) at 58. Notably absent is any sworn testimony or statement by plaintiff whether she received training. Even if the record presents a material fact issue, however, it does not support a reasonable inference that failure to train resulted in a significant change to plaintiff's employment status. Cf. Wright v. C & M Tire, Inc., 545 F. Supp.2d 1191, 1202 (D. Kan. 2008) (evidence suggested that two disciplinary warnings and failure to train placed continued employment at risk). On this record, plaintiff has not established a material fact issue whether failure to train constituted adverse employment action for purposes of her disability discrimination claim.

Plaintiff asserts that by giving her an IA on August 2, 2006, defendant subjected her to adverse employment action. A written warning may constitute adverse employment action if it effects a significant change in plaintiff's employment status. See Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1224 (10th Cir. 2006). Here, plaintiff has not shown that the IA of August 2 had any effect on her employment status. See id. at 1225. On this record, plaintiff has not established a material fact issue whether the IA on August 2 resulted in adverse employment action for purposes of disability discrimination.

Plaintiff asserts that by forcing her to take medical leave on October 13, 2006, defendant subjected her to adverse employment action. The record is devoid of any evidence which suggests that defendant's actions forced plaintiff to take medical leave on October 13. To the contrary, the uncontroverted evidence suggests that as of that date, plaintiff was totally disabled and unable to work. Accordingly, plaintiff has not established a material fact issue whether defendant subjected

her to adverse employment action by forcing her to take medical leave on October 13, 2006. On this record, plaintiff has not shown a genuine fact issue whether defendant subjected her to adverse employment action for purposes of her discrimination claim. Accordingly, defendant is entitled to summary judgment on plaintiff's claims of disability discrimination under the ADA and KAAD.

### B.    Disability Harassment

Plaintiff asserts that defendant subjected her to a hostile work environment in violation of the ADA and KAAD. The Tenth Circuit has held that hostile work environment claims are actionable under the ADA. See Lanman v. Johnson County, Kan., 393 F.3d 1151, 1155 (10th Cir. 2004).[28] To succeed on such a claim, plaintiff must show that (1) she is a qualified individual with a disability; (2) the conduct in question was unwelcome; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) the facts provide a basis for imputing liability to the employer. See id. at 1156-58; Mendia v. Hawker Beechcraft Corp., No. 06-1212-JTM, 2008 WL 216914, at *10 (D. Kan. Jan. 17, 2008); Jones v. Wichita State Univ., 528 F. Supp.2d 1196, 1214 (D. Kan. 2007) (involving sexual harassment claim).

Defendant asserts that plaintiff cannot establish the fourth element, i.e she cannot show that the alleged harassment was sufficiently severe or pervasive to create an abusive working environment.[29] See Defendant's Motion (Doc. #109) at 20-24. To prevail under a hostile work environment theory, plaintiff must show that disability-based conduct had the purpose or effect of

---

[28]    The Court applies the same standards to a KAAD claim. See, e.g., Aramburu, 112 F.3d at 1403 n.3; Kinchion v. Cessna Aircraft Co., 504 F. Supp.2d 1137, 1142 (D. Kan. 2007).

[29]    Defendant's motion does not challenge whether plaintiff can establish the other elements of a hostile environment claim.

unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998). To establish the claim, plaintiff must show both that the conduct to which she was subjected was "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive," and that she "subjectively perceive[d] the environment to be abusive." Harris, 510 U.S. at 21. The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.; see also Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).

Plaintiff asserts that defendant subjected her to a hostile working environment by (1) having co-workers monitor, watch and report her behavior on a daily basis; and (2) making false allegations that she had threatened to kill a co-worker (Ford). See Plaintiff's Response (Doc. #112) at 66-68. With regard to monitoring by co-workers, the uncontroverted evidence establishes that plaintiff did not personally observe the conduct and that she only became aware of it when co-workers told her. Even construed in a light most favorable to plaintiff, the alleged monitoring is not sufficiently severe and pervasive to create an objectively hostile work environment. See, e.g., Mendez v. England, No. CV 04-6630-DSF (Mcx), 2006 WL 4811384, at *5 (C.D. Cal. Nov. 14, 2006) (co-worker spying at supervisor's behest did not create hostile work environment). With regard to the alleged death threat, it was apparently a one-time incident over which defendant held a couple of meetings and did nothing as a result. Even construed in a light most favorable to plaintiff, the alleged conduct is

not sufficiently severe and pervasive to create a hostile work environment. <u>See</u>, <u>e.g.</u>, <u>Townsend v. Harvey</u>, No. SA-05-CA-1140-OG, 2006 WL 2605710, at *6 (W.D. Tex. Sept. 11, 2006) (false accusations regarding plaintiff and asking co-worker to spy on plaintiff insufficient to create objectively abusive workplace); <u>Gustave-Schmidt v. Chao</u>, 360 F. Supp.2d 105, 121 (D.D.C. 2004) (same). On this record, the totality of circumstances alleged by plaintiff does not raise an inference of a workplace so "permeated with discriminatory intimidation, ridicule, and insult" or harassment sufficiently severe or pervasive to have altered the conditions of her employment. <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002). Accordingly, plaintiff has not established a genuine fact issue whether defendant subjected her to an objectively hostile workplace. Defendant is therefore entitled to summary judgment on plaintiff's claim that it subjected her to a hostile work environment in violation of the ADA and KAAD.

## C.     Disability Retaliation

Plaintiff asserts that defendant retaliated in violation of the ADA and KAAD. To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) a reasonable person would have found the challenged action materially adverse; and (3) a causal connection links the protected activity and the materially adverse action. <u>See</u> <u>Hennagir v. Utah Dept. of Corr.</u>, 587 F.3d 1255, 1265 (10th Cir. 2009); <u>Mondaine v. Am. Drug Stores, Inc.</u>, 408 F. Supp.2d 1169, 1189 (D. Kan. 2006). Defendant asserts that plaintiff cannot meet the second and third elements.[30]

---

[30]     Defendant's motion does not address whether plaintiff can satisfy the first element, <u>i.e.</u> that she engaged in protected opposition to discrimination.

### 1.     Materially Adverse Action

Defendant asserts that plaintiff cannot meet the second element of a prima facie case, i.e. she cannot show that she suffered materially adverse action. See Defendant's Motion (Doc. #109) at 18-20. Unlike in disparate treatment cases, a materially adverse action for purposes of a retaliation claim need not affect the employee's terms and conditions of employment; rather, plaintiff must show that a reasonable employee would have found the challenged action materially adverse, i.e. that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). The standard focuses on the employer's retaliatory action, not the underlying discrimination opposed by the employee. See Semsroth v. City of Wichita, 555 F.3d 1182, 1184 (10th Cir. 2009). The standard, while sensitive to the particular circumstances of each case, is an objective inquiry which turns not on plaintiff's personal feelings but on the perspective of a reasonable person in plaintiff's position, considering all the circumstances. See id. In this case-by-case approach, the Court asks whether the record contains objective evidence of material disadvantage or merely the bald personal preferences of plaintiff. See id. at 1185.

Plaintiff claims that in retaliation for engaging in activity protected by the ADA and KAAD, defendant subjected her to the following adverse actions: (1) having co-workers monitor her job performance; (2) giving her an IA on August 2, 2006; (3) investigating her for allegedly threatening to kill a co-worker; and (4) giving her a low performance evaluation on March 9, 2007. See Plaintiff's Response (Doc. #112) at 64.[31]

---

[31]     Plaintiff asserts that co-workers filed complaints against her on a daily basis, see Plaintiff's Response (Doc. #112) at 64, but her statement of facts does not support the assertion. See id. at 8-48.

With regard to the first adverse action, i.e. having co-workers monitor her job performance, plaintiff presents evidence that shortly after she requested and received ADA accommodation (switching to the day shift), Perez asked her co-workers to monitor and report on her job performance. The evidence suggests that such action was against defendant's policy and that Mattivi and VanWinkle believed that Perez had acted inappropriately. Construing the evidence in a light most favorable to plaintiff, a reasonable jury could conclude that such action would dissuade a reasonable worker from pursuing a charge of discrimination. See, e.g., Brandau v. State of Kan., 968 F.Supp. 1416, 1422 (D. Kan. 1997) (genuine fact issue whether monitoring plaintiff's attendance, auditing her case files and overseeing all of her correspondence constituted adverse action for retaliation claim). On this record, plaintiff has established a material fact issue whether having co-workers monitor her job performance constituted materially adverse action for purposes of her retaliation claim. Defendant is not entitled to summary judgment on this claim.

With regard to the second adverse action, i.e. giving her an IA on August 2, 2006, plaintiff presents evidence that because she received the IA, she was not eligible to transfer to other departments. Construing the evidence in a light most favorable to plaintiff, a reasonable jury could conclude that such action would dissuade a reasonable worker from pursuing a charge of discrimination. See, e.g., Billings v. Town of Grafton, 515 F.3d 39, 54-55 (1st Cir. 2008) (by their nature, acts of reprimand could dissuade reasonable employee from charging discrimination); Henton v. City of New London, No. 3:06 CV 2035(EBB), 2008 WL 2185933, at *14 (D. Conn. May 23, 2008) (reasonable jury could find that disciplinary actions constituted materially adverse action for retaliation claim); Monclova v. City of New York, No. CV 05-3164 (DGT), 2008 WL 822117, at *7 (E.D.N.Y. March 26, 2008) (disciplinary charges could reasonably dissuade employee from

claiming discrimination); <u>Holden v. Ill. Tool Works, Inc.</u>, No. H-06-2981, 2008 WL 183334, at *10 (S.D. Tex. Jan. 18, 2008) . On this record, plaintiff has established a material fact issue whether the IA of August 2 constituted materially adverse action for purposes of her retaliation claim. Defendant is not entitled to summary judgment on this claim.

With regard to the third adverse action, <u>i.e.</u> investigating plaintiff for allegedly threatening to kill a co-worker, the record contains scant information.[32] In her statement of facts, plaintiff alleges the following facts:

- On August 3, 2006, defendant contends that Ford reported to VanWinkle that plaintiff had threatened to kill her. <u>See</u> <u>Plaintiff's Response</u> (Doc. #112) at 16, ¶ 66.

- On August 4, 2006, VanWinkle (1) met with Bjuland and James to discuss the threat; (2) met with Ford to discuss the threat; and (3) allegedly obtained a written statement from Ford regarding the threat. <u>See</u> <u>id.</u> at 16, ¶¶ 67-69.

- Mattivi testified that he did not have an opinion regarding whether plaintiff had threatened Ford and that he did not speak to plaintiff about it. <u>See</u> <u>id.</u> at 35-36, ¶ 169.

In short, it appears that the "investigation" involved several meetings on one day and obtaining a written statement from the alleged victim. Plaintiff presents no evidence which suggests that (1) defendant did not have a reasonable basis to investigate the alleged threat; (2) defendant took any action against plaintiff as a result of the investigation; or (3) plaintiff even knew about the investigation. On this record, even construing the evidence in a light most favorable to plaintiff, a reasonable jury would not conclude that such action would dissuade a reasonable worker from pursuing a charge of discrimination. <u>See, e.g.</u>, <u>Rademakers v. Scott</u>, 350 Fed. Appx. 408, 412-13

---

[32] In the pretrial order, plaintiff's factual contentions do not include this allegation. <u>See</u> <u>Pretrial Order</u> (Doc. #107) at 3-5. Defendant does not object to the Court considering it on this ground. <u>See</u> <u>Defendant's Reply</u> (Doc. #114) at 13-16.

(11th Cir. Oct. 28, 2009); cf. Rhodes v. Napolitano, 656 F. Supp.2d 174, 185-86 (D.D.C. 2009) (length and scope of many-month investigation and tone of counseling letter might deter reasonable employee from engaging in protected activity). Plaintiff has not established a material fact issue whether the investigation of her alleged threat to kill a co-worker constituted materially adverse action for purposes of her retaliation claim. Defendant is entitled to summary judgment on this claim.

With regard to the fourth adverse action, i.e. giving her a low performance assessment on March 9, 2007, plaintiff alleges the following facts regarding the performance assessment: (1) although supervisors typically completed performance assessments, Mattivi completed hers; (2) Mattivi testified that he did not recall why he completed the assessment; (3) in the performance assessment, Mattivi stated that plaintiff's work was "very satisfactory" and that she "usually produces error free work;" and (4) before completing the assessment, Mattivi discussed it with Ruth Dodd, Bill Rawlings and Perez.[33] Plaintiff's Response (Doc. #112) ¶¶ 165-66, 223-24, 226.[34] The undisputed facts establish that at the time of the assessment, plaintiff had not worked for five months and was completely disabled and unable to return to work. On this record, even construing the evidence in a light most favorable to plaintiff, a reasonable jury would not conclude that the March 9

_____

[33]    The record does not identify Dodd or Rawlings.

[34]    In her statement of facts, plaintiff presents evidence that she received the following performance ratings: (1) for 2003, 5.9 – satisfactory; (2) for 2004, 5.75 – satisfactory; (3) for 2005, 6.75 – between satisfactory and commendable. See id. at 43-44, ¶¶ 211-212.
       In her argument section, plaintiff states for the first time that on the performance assessment of March 9, 2007, Mattivi gave her an overall performance rating of 2.87. Plaintiff did not include this fact in her statement of facts, and the Court therefore does not consider it. Moreover, even if plaintiff had included the fact in her statement of facts, she did not support it with record citations, did not identify for what year the performance rating applied and provided no information regarding the overall performance scale or whether a rating of 2.87 would result in negative impact.

performance assessment would dissuade a reasonable worker from pursuing a charge of discrimination. Plaintiff has not established a material fact issue whether the March 9 performance assessment constituted materially adverse action for purposes of her retaliation claim. Defendant is entitled to summary judgment on this claim.

### 2. Causal Connection

In half a sentence, defendant asserts that plaintiff cannot meet the third element of a prima facie case, i.e. she cannot show a causal link between protected activity and materially adverse action.[35] See Defendant's Motion (Doc. #109) at 20. Defendant does not identify the legal standard and offers no legal analysis regarding why it contends that plaintiff cannot establish causation. See id. at 18-20; Reply Brief In Support Of Defendant Quest Diagnostics' Motion For Summary Judgment ("Defendant's Reply") (Doc. #114) at 16-17. The Court will not construct legal arguments or theories on defendant's behalf. See In re Motor Fuel Temp. Sales Practices Litig., 534 F. Supp.2d 1214, 1235 (D. Kan. 2008). On this record, defendant has not shown that it is entitled to summary judgment on the ground that plaintiff cannot show a causal link between protected activity and materially adverse action.[36]

---

[35] In its motion for summary judgment, defendant's only statement regarding causation is as follows:

> As discussed above, plaintiff cannot show that she experienced any qualifying "adverse employment action" during her employment, let alone that a causal connection existed between such unspecified action and her claimed medical condition.

Defendant's Motion (Doc. #109) at 20.

[36] On the other hand, in response to defendant's motion regarding causation, plaintiff spends two pages discussing facts which she did not include in her statement of facts, see Plaintiff's Response (Doc. #112) at 64-66, and offers no legal analysis or discussion regarding facts in the

(continued...)

### D. Constructive Discharge

Plaintiff alleges that because of defendant's discrimination, she was forced to take leave on October 13, 2006. See Pretrial Order (Doc. #107) at 5. An employee is constructively discharged "when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." MacKenzie v. City & County of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005). The Court evaluates the voluntariness of an employee's resignation under an objective, totality of the circumstances standard. Id. The constructive discharge bar is "quite high." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002). The question is not whether plaintiff's working conditions were difficult or unpleasant. See Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004). Instead, plaintiff must show that she had no other choice but to quit. Garrett, 305 F.3d at 1221.

Defendant asserts that plaintiff cannot show that her conditions of employment were objectively intolerable. See Defendant's Motion (Doc. #109) at 24. In response, plaintiff asserts that "defendant has failed to provide any evidence to suggest that a reasonable person would not have felt compelled to resign, and this presents a question of fact for the jury." Plaintiff's Response (Doc. #112) at 69. Plaintiff's response misses the boat. It is *plaintiff* – not defendant – who bears the burden of establishing a material fact issue for the jury. See Applied Genetics, 912 F.2d at 1241. Specifically, plaintiff must show under an objective standard that defendant allowed her working conditions to become so intolerable that she had no other choice but to quit. See MacKenzie, 414 F.3d at 1281. On this record, plaintiff has not done so. Plaintiff cites her own deposition testimony that her work conditions made it subjectively impossible for her to perform her job. See Plaintiff's

---

[36](...continued)
record.

Response (Doc. #112).[37]  Plaintiff did not include this testimony in her statement of facts.  See id. at 8-48.  Even if the Court considered the testimony, it does not support an inference that a reasonable person would have no choice but to quit.  The undisputed facts show that in August of 2006, plaintiff transferred to the general chemistry department.  The record contains no evidence which suggests that after the transfer, the conditions of plaintiff's employment were objectively intolerable.  On this record, plaintiff has not established a material fact issue whether defendant constructively discharged her.  Defendant is entitled to summary judgment on this claim.

### E.    Negligent Infliction Of Emotional Distress

Plaintiff asserts a claim for negligent infliction of emotional distress.  See Pretrial Order (Doc. #107) at 9-10.  In one sentence, defendant argues that the Kansas Workers Compensation Act, K.S.A. § 501 et seq., bars plaintiff's claim.  See Defendant's Motion (Doc. #109) at 28.  In support of its assertion, defendant provides no discussion of evidence or legal analysis, see id., but only an incomplete citation to one case, Carraway v. Cracker Barrel Old Country Store, Inc., No. Civ. A. 02-2237-KHV, 2003 WL 21685909, at *15 (D. Kan. July 16, 2003), for which it misconstrues the holding.[38]  The Court will not construct legal arguments or theories on defendant's behalf.  See In

---

[37]     The deposition testimony states as follows:

> The work conditions were impossible to perform my duties under.  [sic]  The last day I worked, the chemistry supervisor stopped me and said something about being tardy and she couldn't – it would be hard to keep me because of that.  I assumed she meant they were going to fire me and I figured – I was afraid and it made it even more difficult to go to work under the idea that they were going to fire me anyway, and that's when I became unable to tolerate it at all and the doctor told me to not – to take another leave.

Plaintiff's Response (Doc. #112) at 71.

[38]     In parenthetical citation, defendant states that Carraway granted summary judgment
(continued...)

31

re Motor Fuel, 534 F. Supp.2d at 1235.  On this record, defendant has not shown that it is entitled to summary judgment on plaintiff's claim for negligent infliction of emotional distress.

### F.    Intentional Infliction Of Emotional Distress

Plaintiff asserts a claim for intentional infliction of emotional distress.  See Pretrial Order (Doc. #107) at 10.  To establish a prima facie case of intentional infliction of emotional distress, plaintiff must prove that (1) defendant acted intentionally or in reckless disregard of plaintiff; (2) defendant's conduct was extreme and outrageous; (3) a causal connection exists between defendant's conduct and plaintiff's mental distress; and (4) plaintiff suffered extreme and severe mental distress. See Roberts v. Saylor, 230 Kan. 289, 292, 637 P.2d 1175, 1179 (1981).  Defendant asserts that plaintiff cannot meet the second or fourth elements.  See  Defendant's Motion (Doc. #109) at 27-28.

### 1.    Extreme And Outrageous Conduct

To satisfy the second element of a prima facie case, plaintiff must show that defendant's conduct was extreme and outrageous.  See Roberts, 230 Kan. at 292, 637 P.2d at 1179. In determining what conduct may be regarded as "extreme and outrageous," the Kansas Supreme Court has set forth the following standard:

> [l]iability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.  It was further

---

[38](...continued)
against plaintiff "on his negligent infliction of emotional distress claim against his former employer."  Carraway did not involve a claim for negligent infliction of emotional distress.  Rather, the Court granted summary judgment on plaintiff's claim that defendant negligently failed to provide a safe working environment.  See Carraway, 2003 WL 21685909, at *15.  The Court noted that defendant claimed that the Kansas Workers Compensation Act precluded plaintiff's claim, see id., but it did not decide the issue on that ground.  Rather, the Court found that Kansas law does not permit recovery in tort for emotional distress unless it is accompanied by physical injury, and that plaintiff did not claim physical injury.  See id.  On those grounds, the Court granted summary judgment in favor of defendant on plaintiff's negligence claim.  See id.

said that liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, "Outrageous!"

It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expression, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt . . . . Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society.

Id. at 293, 637 P.2d at 1179.

Plaintiff contends that defendant engaged in the following conduct: having co-workers monitor and submit complaints regarding plaintiff; investigating plaintiff for alleged performance problems; and falsely accusing that she threatened to kill a co-worker. See Plaintiff's Response (Doc. #112) at 75-76. On its face, such conduct is not "outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." Roberts, 230 Kan. at 293, 637 P.2d at 1179. Even construed in a light most favorable to plaintiff, the evidence does not create a genuine fact issue whether defendant engaged in extreme and outrageous conduct. Defendant is entitled to summary judgment on this ground.

### 2.    Whether Plaintiff Suffered Extreme And Severe Mental Distress

Even if plaintiff met the threshold requirement of showing "extreme and outrageous" conduct, she has not established that she suffered severe emotional distress. To satisfy this element, plaintiff must show that she suffered emotional distress in such extreme degree that no reasonable person should be expected to endure it. See Roberts, 230 Kan. at 292-94, 637 P.2d at 1179. The Kansas Supreme Court has adopted Restatement (Second) of Torts § 46(1) (1963), and comments j and k to that section are instructive on this issue:

The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. * * *

The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge. * * *

It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed. * * *

Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe. The rule stated is not, however, limited to cases where there has been bodily harm; and if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm. In such cases the court may perhaps tend to look for more in the way of outrage as a guarantee that the claim is genuine; but if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required.

Taiwo v. Vu, 249 Kan. 585, 594-95, 822 P.2d 1024, 1030-31 (1991) (quoting Restatement (Second) of Torts § 46(1) (1963), comments j and k).

Plaintiff contends that as a result of defendant's conduct, she suffered "severe emotional distress, including extreme anxiety, depression, paranoia, sleeplessness, racing thoughts, crying spells, overall decline in functioning, hopelessness and suicidal thoughts." Plaintiff's Response (Doc. #112) at 74. Plaintiff's response is problematic, however, because she provides no record evidence to support that she experienced these symptoms, or the frequency or severity thereof. On this record, plaintiff has not created a genuine fact issue whether she suffered emotional distress "so severe that no reasonable person should be expected to endure it." Roberts, 230 Kan. at 293, 637 P.2d at 1179. Defendant is entitled to summary judgment on plaintiff's claim for intentional infliction of emotional distress.

### G. FMLA Retaliation

Plaintiff asserts that defendant retaliated against her in violation of the FMLA.  See Pretrial Order (Doc. #107) at 10-11.  Defendant seeks summary judgment based on the following deposition testimony by plaintiff:

> Q.    Do you allege that Quest Diagnostics unlawfully retaliated against you for taking approved FMLA leave?
>
> A.    No.

Plaintiff's Depo. at 105:14-17.[39]  Without providing any legal authority or analysis, defendant contends that plaintiff's testimony bars her FMLA retaliation claim as a matter of law.  As previously noted, the Court will not construct legal arguments or theories on defendant's behalf. See In re Motor Fuel, 534 F. Supp.2d at 1235.  Moreover, the Court's independent research suggests that defendant's position is without merit.  See, e.g., McGuire v. Bourbon Cmty. Hosp., No. Civ. A 04-480-KSF, 2006 WL 208826, at *3 (E.D. Ky. Jan. 26, 2006) (defendant provided no legal support for "abandonment by deposition" theory and court could find none – legal issue whether claim has

---

[39]    Later in her deposition, plaintiff testified as follows:

> Q.    You allege in your complaint that Quest Diagnostics retaliated against you because of your request for a reasonable accommodation in an effort to force you back into an indefinite leave of absence.
>               What are you referring to?
>
> A.    Is that a written statement?
>
> Q.    In the complaint, yes.
>
> A.    They wanted me gone.  They discriminated against me because I had taken FMLA and came back and asked for a reasonable accommodation, and was treated poorly from then on.

Plaintiff's Depo. at 159:18 to 160:3.

been abandoned requires much more than lay person's opinion); <u>Jones v. HSBC Bank USA</u>, No. 00-CV-532A, 2004 WL 1563080, at *3 (W.D.N.Y. June 17, 2004) (deposition testimony did not evince intent to abandon claim where plaintiff did not affirmatively state that she intended to abandon her claim and she was not asked that question).  On this record, defendant has not shown that it is entitled to summary judgment on plaintiff's FMLA retaliation claim.

**H.      FMLA Interference**

Plaintiff asserts that defendant interfered with her right to take FMLA leave.  <u>See</u> <u>Pretrial Order</u> (Doc. #107) at 11-12.  Defendant seeks summary judgment based on the following deposition testimony by plaintiff:

Q.      Was there ever an occasion that you requested leave pursuant to the Federal Family and Medical Leave Act that you were denied.

A.      No.

* * *

Q.      Do you contend that Quest Diagnostics violated the FMLA?

A.      No, not the FMLA.

<u>Plaintiff's Depo.</u> at 103:11-14, 105:8-10.  Again, defendant provides no legal authority or analysis to support that such testimony bars plaintiff's FMLA interference claim as a matter of law.  The Court will not construct legal arguments or theories on defendant's behalf.  <u>See</u> <u>In re Motor Fuel</u>, 534 F. Supp.2d at 1235.  Moreover, the Court's independent research suggests that defendant's position is without merit.  <u>See</u>, <u>e.g.</u>, <u>McGuire</u>, 2006 WL 208826, at *3; <u>HSBC Bank</u>, 2004 WL 1563080, at *3.  On this record, defendant has not shown that it is entitled to summary judgment on plaintiff's FMLA retaliation claim.

**IT IS THEREFORE ORDERED** that <u>Defendant Quest Diagnostics Incorporated's Motion</u>

For Summary Judgment And Supporting Brief (Doc. #109) filed June 25, 2010 be and hereby is **SUSTAINED in part.** The Court grants summary judgment in favor of defendant on the following claims: (1) disability discrimination after October 13, 2006 in violation of the ADA and KAAD; (2) hostile work environment in violation of the ADA and KAAD; (3) retaliation in violation of the ADA and KAAD for (a) investigating plaintiff for allegedly threatening to kill a co-worker and (b) giving her a low performance evaluation on March 9, 2007; (4) constructive discharge; and (5) intentional infliction of emotional distress.

The following claims remain in the case: (1) disability discrimination on or before October 13, 2006 in violation of the ADA and KAAD; (2) retaliation in violation of the ADA and KAAD for (a) having plaintiff's co-workers monitor her job performance and (b) giving her an IA on August 2, 2006; (3) negligent infliction of emotional distress; (4) retaliation in violation of the FMLA; and (5) interference with plaintiff's rights under the FMLA.

Dated this 24th day of September, 2010 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge